Next on the calendar this morning is Obeya v. Sessions Why don't you wait a second? Sure. Are there more members of your team who you were expecting? Very good. Okay, please proceed. May it please the court, Richard Mark Gibson Dunn and Crutcher for the petitioner Clement Obeya. Your Honors, from the 1940s through the end of 2016, roughly 70 years, the Board of Immigration Appeals had a clear rule. For a theft offense to be a crime involving moral turpitude, the offense had to require for conviction proof that the defendant intended to deprive the owner of property permanently. Not in dispute. New York's larceny statute includes elements that allow conviction without proof of intent to deprive the owner of property permanently. So, categorically, New York's petty larceny statute did not meet the BIA's longstanding standard for a crime involving moral turpitude. And that's not in dispute either. Thus, when Mr. Obeya pleaded guilty to petty larceny in New York State in 2008, he did not admit to, and he was not convicted for committing a crime that was categorically a crime involving moral turpitude and categorically- This court remanded. Should it not have remanded? Should it have simply reversed? I argued at the time that the court could have done that. It could have taken that as a matter of law, but the court had discretion to remand. What was it remanding for? The court, I believe, was remanding- Categorical offense. Statute has to be read categorically. That's right. An element in the statute that says if you- to the effect that if you use it in a way that destroys the economic value of the property, that's the equivalent of theft. But that's not part of the definition at the time. That's your argument. What's the point of the remand? The point of the remand is, as in numerous instances where you have an appellate court facing an issue of law, if the lower tribunal has not had an opportunity to address the issue, it is giving the lower tribunal a chance to do so. As of that time, there was no precedential decision of the Board of Immigration Appeals that said that petty larceny in New York was a crime involving moral turpitude. This decision involving Mr. Obeya is the first time that the board has said that. What is significant, though, is when you look to 2008, when you look to 2008, what is the state of the law at that time? And there are precedential decisions of the BIA which lay down what both the Obeya decision on review now and the Diaz-Lizarraga decision on which it relies say that permanent deprivation of property is essential and must be proved for this to be a crime involving moral turpitude. You also have other decisions, and I concede that they are non-precedential, but they are non-precedential going both, some going both ways, but there are non-precedential decisions saying that the intent element, the same intent element that's being considered here does not rise to the level of permanent deprivation. And that was the state of the law in 2008. There are other decisions, precedential decisions going back to the 1940s, oddly, made in cases involving measuring Canada's theft statute against U.S. law, saying that when you have a statute that includes both temporary and permanent deprivation, that's not enough to meet the crime involving moral turpitude standard. Is it fair to characterize our prior decision as saying something like the BIA in this case treated petty larceny as if it were a crime of moral turpitude categorically, but that is in apparent conflict with the existing precedent about what a crime involving moral turpitude is in the area of larceny. And since you, the BIA, have not previously formally addressed how the New York law matches up with the definition of crime involving moral turpitude, take a shot and tell us what you think. Is that a fair way of characterizing it? I will accept that as a fair way of characterizing the decision. And what also exists at that time. And what you're saying is, and they took their shot and they didn't take their shot. They instead said, we just today, coincidentally, decided to change the rule about what is a crime involving moral turpitude in the zone of larceny statutes. And under our new definition, New York petty larceny qualifies. And your argument is that is a retroactive change because Mr. Obeah and people like him could have relied, would reasonably have relied, in taking guilty pleas on the idea that New York petty larceny could not be a crime involving moral turpitude under the then existing BIA precedents. That's exactly right. And obviously this court, and Judge Carney was on that panel, knows what it had in mind when it sent it back. But as a backdrop to that, this court had decided the Walla case at that time. And Walla ultimately held in that circumstance, the crime involved there, petty larceny in Connecticut, statute similarly worded to the New York statute, where the BIA had decided in that case that a permanent taking was required in the context of the Connecticut statute. They said at that time, applying a modified categorical approach, what's proved there does not rise to the level of permanent deprivation. What you see in the decisions here in Diaz-Lizarraga and in the Obeah case itself is recognition by the BIA that unless the standard was changed to go from permanent taking to something less demanding than that, petty larceny in New York would not be a crime involving moral turpitude. And the retroactive application of that is the basis for granting the petition in this case. And in Diaz-Lizarraga itself, the BIA said this is a change, we used to say something, and now we're saying something different, didn't they? That is correct. It can't be contested. If you look at the retroactivity factors here, really the action I think is in factors two and three, because the government does concede it would be extremely burdensome and deleterious to Mr. Obeah for him to be sent back to Nigeria. But in two and three, those together really focus on is this a new rule, an abrupt change? I would say it was not an abrupt departure. They would say this was reflecting kind of evolving standards and this is, you know, the substantial erosion standard is kind of encompassed in what we've always talked about as larceny, right? That is the government's argument, and I think on the face of the Diaz-Lizarraga case and Obeah, where they acknowledge what they're doing, indeed at the end of Diaz-Lizarraga, they note with a cite to Justice Holmes' essay in the path of the law, you know, why should we be stuck with some rule that's been around just because it's 70 years old? They know they are changing something from permanent to less than permanent, and that means it's an abrupt and significant change and can't be applied retroactively. I'll reserve the balance of my time. Thank you very much. Ms. Browning. Thank you, Your Honor. May it please the court, Rachel Browning for the respondent. This case presents the issue of whether petitioner's conviction for petty larceny in violation of New York Penal Code 155.25 is a crime involving moral turpitude in light of the statute's requirement that an individual intend either a permanent or virtually permanent deprivation or appropriation of the victim's property. And in matter of Diaz-Lizarraga, which was issued as a companion to the decision in this published decision, in this case, the board clarified that a theft offense qualifies as a categorical CIMT if the conviction requires an attempt to deprive the owner of property either permanently or under circumstances where the owner's property rights are substantially eroded. Well, when you say they clarified that, in their own language, they changed their interpretation, did they not? Isn't that what the BIA itself said in Diaz-Lizarraga? I recognize there's language in the decision to that effect. However, I would suggest that this is more of a refinement of the law or of the definition of CIMT in the larceny context. If you look at the fact that the board also emphasized that it wasn't taking away the permanent versus temporary distinction. They were simply filling a void or a gap in the law that really didn't address these sort of virtually permanent. Talking about an extended period. Correct. But that's different from permanent, isn't it? An extended period is different from a permanent period. What the board was emphasizing when it looked to the penal code, model penal code, and the 39 states- Between something that was permanent and something that was an extended period. Correct. Isn't that different? It's different to the extent that there's a literal taking and then a literally permanent taking and a permanent taking that might not be literal, but where the erosion of property rights are such that it might as well have been. And so the issue goes to the reprehensibility of the act. Isn't that why the drafters of the model penal code recommended in the first place back in the 1960s changing the law of larceny? Because it recognized that the common law standard of intent to deprive permanently was sometimes difficult to prove, and there were many acts that are just as bad as depriving someone permanently of their property. And so the model penal code recommended a change in the common law. The states reacted, and it took a long time for the BIA to get around to saying, yeah, it's time to change our understanding to incorporate that change in the criminal law of a majority, but not all, states. So, yeah, I don't think anybody's contesting, at least for purposes of this case, that it's going forward. There's something arbitrary and capricious or wrong about the BIA's current interpretation of what is a crime involving moral turpitude. The issue is only, is this a new rule or an old rule? But how can you say it's an old rule when the board itself says we're changing our longstanding 70-year-old rule to bring it into conformity with modern law? I would say that the board is clarifying or refining. The old law still applies. If you look at the cases, the published decisions, the board made the distinction between temporary and permanent. The joyriding, whether you're borrowing something, that still stands. That's not a change. But isn't that because in a joyriding statute, there is not evidence of the intent to inflict this additional element of so much of a deprivation that it deprives the owner of most of the economic value? So a joyriding statute still doesn't qualify under the new standard. The question is, what qualifies, what was the change? The change picks up statutes that were not picked up by the old standard and are picked up by the new one. The fact that there are still other statutes that aren't even picked up by the new standard, I'm not sure how that affects whether it's a change that is relevant insofar as it picks up the statute that is applied to Mr. Obeya. I think I would say that the law was unclear as to whether the New York State Penal Code statute or penal codes like it that covered virtually permanent takings would have been covered because you also had published board decisions stating that larceny was a crime involving moral... But in dictum, they just say that. They say larceny, just like they did in Obeya's first case where we reversed. But in those cases, that wasn't even an issue. In Obeya's case, it was an issue. And we reversed because the board, we thought erroneously, had applied this sort of vague dictum that all larceny is a crime involving moral turpitude when that was not in fact the board's standard, right? Is there a case in which the BIA deported someone who made the argument that this statute under which I was convicted does not have the element of intent to permanently deprive and the board said, yeah, right, it doesn't, but we don't care. Is there any actual holding like that, published, unpublished, or otherwise? I'm aware of a handful of unpublished board decisions where a conviction under this statute was found to be a crime involving moral turpitude. I don't know, I can't get into the specifics of what was argued, but it's a reasonable reliance. But isn't that significant if the board makes some error that no one calls to its attention about what its own standard is and how that matches up with the petty larceny statute before it? How does that make new law or throw the law into some genuine state of confusion if all that happened was an argument isn't raised and the board says something that is in a non-published opinion, no less? I think, I mean, when you're talking about reasonable reliance with the breadth of the decisions that the board had at the time, it would be hard to say, no, in my situation, in this case, this could never be considered a crime involving moral turpitude when you have decisions saying we can presume a permanent taking. But of course, if you say we presume a permanent taking, doesn't that raise problems under the categorical approach? I mean, another problem with some of this board case law, some of it is very old, and it strikes me that it may not have been applying the categorical approach as the Supreme Court has clarified it, so to speak, in recent years. Well, in the application, I would say that the application of the categorical approach to crimes involving moral turpitude is still in a state of flux. I mean, the board is applying or attempting to apply the categorical approach in crimes involving moral turpitude, but it's going to be necessarily different from other statutes or the aggravated felony context where the elements either line up clearly or don't. This ambiguous nature of the term crime involving moral turpitude is one that the board has the authority to readdress and refine and reconsider under principles of Chevron and Brandeis, and so we would ask that. But the agency did not conduct an explicit retroactivity analysis, even though it acknowledged that this was a change in the law. And you've argued on appeal that there's an interest in uniformity, which I would see as going forward, but the agency hasn't really grappled with the import of applying this significant departure, in my view, to Mr. Obeya, who entered his plea based on an entirely different understanding about what the law required. Is it your position that there's an interest in uniformity that outweighs the burden that this places on Mr. Obeya's shoulders? Absolutely, Your Honor. I think the board has a strong interest in uniformity as well. But uniformity going forward? I mean, you're not going to go and undo and change all the activity that's happened in the several years since Mr. Obeya entered his plea. I think it would be incredibly burdensome on immigration judges and boards to look at each circumstance that comes before it and to say, well, what did they rely on at the time? What was the state of the law in 2008? Is that when the plea was entered? Why is that so difficult? I think it was unclear. I think there were decisions going both ways in terms of making a strong temporary versus permanent distinction and others not suggesting that there was such a distinction and others saying that the permanent intention could be presumed. And Mr. Obeya himself never raised the argument. When it came before the immigration judge, he said the only argument that was presented was that this meets the petty offense exception. If he had relied, in fact, at the time, then that should have been the first thing he brought to the attention of the immigration judge. And so I think that is very telling as to what— So you also think that this court got it wrong the last time because we should have held that that argument was waived, the argument that the larceny was— No, I understand why the court chose to do what it did. It did have de novo review or the authority to review the issue itself de novo, and it chose instead to give the board a chance to address the issues that had not been raised to the board before that. If we conclude that there is a significant retroactivity problem, is it your contention or have you argued that we ought to remand yet again to let the board take the first crack at the retroactivity issue? The court could do that. I mean, the first issue is whether the board acted reasonably in refining its definition of crime involving moral turpitude in the larceny context. Why is that the issue? I mean, suppose—I assume that it is. I mean, I think—frankly, I think it is a reasonable interpretation on a going-forward basis, and while Mr. Mark may disagree, I don't think that's the argument that he's presenting here today, that we should say the board acted unreasonably in changing its interpretation. He's only saying that it should not—its change shouldn't apply retroactively. That's a different question than whether it's a reasonable— It's absolutely a different question. I'm not contesting that. I'm simply saying that if you get to the point of determining that, yes, this is a reasonable interpretation, and, yes, the New York State statute does meet that new definition, then you could very well remand to the board to apply the retroactivity analysis in the first instance. What would be the administrative consequence if we simply held that Mr. Obeye should be allowed to stay in this country, that his crime was not one of moral turpitude as the law was defined at the time? Well, in that case, this Court would have applied the retroactivity analysis itself. You have one case. Is there an administrative morass that would be consequent to our decision? It depends on whether this Court decided whether or not it would defer to the board's broader definition. Suppose we thought that this case had been around too long a time and it was time to put a close to it, and we simply reversed with instructions to free Mr. Obeye or allow him to stay. Are you speaking of reversing the ultimate decision of whether the statute meets the board's new definition or find out— Or simply hold that the statute, however well designed it now is, was a retroactive application that was impermissible? I think it would still leave open the question as to how, going forward, these statutes should be defined. We're talking about a lot of state statutes that encompass— It's now a situation where the board has made its law conform to the modern penal code as applied in most states. So that's a pretty good statement that it's a good law going forward. Correct. And we just simply said that as to Mr. Obeye, it's a impermissible retroactive application, and Mr. Obeye should be allowed to stay in the United States. What would be the administrative consequence to you? Seems to be nothing. One person would not have to be deported. That's it. But that could be also applied to anybody else. Is there anybody else? Not that I'm aware of at this time, but certainly, I mean, many people are convicted under the New York State Penal Code. So it would be—presumably, if we said this could not be applied retroactively, then anyone who pled guilty to petty larceny in New York before the date of the Diaz-Lizarraga decision would be governed by the same rule that we would be applying to Mr. Obeye. Is that the—but we don't know how many such people are in the system. And it's a matter of always— But, of course, that would just be applying the law as it stood then and as matter of Lizarraga, the other—the previous controlling statute was, and that's what everyone's expectations were at the time. The Diaz-Lizarraga was decided November of 2016. They were decided on the same day. A year ago. Matter of Obeye and matter of Diaz-Lizarraga. Sorry? Matter of Obeye and matter of Diaz-Lizarraga were decided on the same day, November— 2016. Correct. All right. Thank you very much. Thank you. Mr. Mark, you have two minutes for rebuttal, please. Judge Hellerstein, I think the administrative consequences of a decision granting the petition in this case would be clarity. You would have a clear rule that said, at least going forward from Diaz-Lizarraga, we know that this is what the rule is today, but before, that's what the state of law was. Apply it then. And if such cases come up, you know, people will argue them at the time. Going forward, there may be some other case that will arise after Diaz-Lizarraga where someone will make an argument about the change in the rule and whether it was reasonable and all that, but we're not doing that here. It would be somewhat dictum for us if we decided that, assuming that it is a reasonable interpretation going forward, nevertheless it can't be applied in this case, then this would not be an appropriate case, perhaps, to make a definitive declaration of whether it is a reasonable rule or not because that's not really at issue. That's not something you're arguing in this case. You don't have to reach the question of whether Diaz-Lizarraga is substantively right. Whether reasonable or not, it should not be applied retroactively. That's correct. In the meantime, pleas entered prior to the issuance of Diaz-Lizarraga would have been governed by matter of grossly. That's right. And that's not disturbed. That's not disturbed. And, again, as far as the state of the law, again, how decisions were rendered and the basis for them, you know, is important to understanding what's going on here. The only decision that is cited, I believe, in the government's brief for a pre-2008 BIA non-presidential ruling that says 155.25 is a crime involving moral turpitude is a matter of Joseph Pierre. And what you read when you get to the bottom of the first page of that case is that the charged party had not contested the issue. So these issues were not fleshed out, were not litigated, were not focused on until this moment. And when the BIA got to focus on it, it changed the rule. The actual issue decided in that case was a different issue. Correct. Correct. Very good. Thank you very much. Thank you, Your Honors. We'll reserve decision.